Filed 9/11/20  In re S.R. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.R., a Person Coming Under the Juvenile Court Law. | B304211 |
| | (Los Angeles County Super. Ct. Nos. 19CCJP03056 19CCJP03058) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| SANTIAGO V., | |
| Defendant and Appellant. | |

APPEAL from an order  of the Superior Court of Los Angeles County, Rashida A. Adams, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, Veronica Randazzo, Senior Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

S. tested positive for amphetamines at the time of his birth in May 2019.  The juvenile court exercised jurisdiction over S. pursuant to Welfare and Institutions Code section 300, subdivision (b)(1),[1] due to ongoing substance abuse by appellant Santiago V. (father) and S.'s mother.  Father then enrolled in and completed a substance abuse treatment program, and was otherwise in compliance with the case plan at the time of the six-month review hearing in January 2020.

The Welfare and Institutions Code states that at a six-month review hearing, the court "shall" return a child to the parent's custody unless doing so "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).)  Father requested that S. be released to his custody, but the juvenile court denied father's request, finding that an extended transition period was warranted in light of father's long history of substance abuse.  Father appealed.

We affirm.  The court's finding that returning S. to father's care would create a substantial risk of detriment to S. was supported by substantial evidence.

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

# FACTUAL AND PROCEDURAL BACKGROUND

## A. Detention

The Los Angeles County Department of Children and Family Services (DCFS) received a referral in May 2019 after S. and mother tested positive for amphetamines at the time of S.'s birth.[2] A nurse reported that mother had also tested positive for amphetamines during a visit to the hospital approximately three weeks earlier. When a social worker visited the hospital two days after S.'s birth, S. was in good health and did not show signs of withdrawal.

Mother told the social worker that she lived with father at paternal grandparents' home. Mother said she also had a 4-year-old daughter, G., who lived with maternal grandmother and maternal aunt; mother did not know the identity of G.'s father. Mother said her longest period of sobriety in the past three years was 21 days, but also said she had used methamphetamines only once or twice during her pregnancy. Mother said father did not know she was using drugs while pregnant. She said she had received limited prenatal care, but could not remember the name of the clinic or medical provider. Mother expressed regret for using drugs while pregnant and said she was willing to work with DCFS.

The social worker met with father at the hospital. Father denied any past or current substance abuse, and said he did not know mother was using drugs. Father said that he and mother often argued "due to issues of homelessness as they often slept in a vehicle" and because mother had mood swings. Father

_____

[2]Mother is not a party to this appeal, and the placement of mother's daughter, G., is not at issue in this case. We therefore focus primarily on facts relevant to father and S.

3

expressed a willingness to submit to drug testing, and asked that S. be released to him upon discharge from the hospital. Later that day, however, father told the social worker that he had not completed his drug test because he was afraid he would test positive for marijuana and alcohol. Father also said his family did not want DFCS near their home, and that father did not have a home for S.

The social worker interviewed a maternal aunt, Mercedes, who said G. had been in her care for six months. Mercedes asked that G. remain placed with her. She said that about four weeks earlier, mother had been incarcerated and charged with possession of illicit substances and drug paraphernalia. Another maternal aunt, Jasmine, also was aware of mother's recent incarceration, and said mother had been "living on the streets, sleeping in a car." Mercedes could not take S. due to her rental contract; Jasmine asked to be assessed for S.'s placement.

DCFS detained both G. and S. G. was placed with Mercedes, and S. was placed in foster care. DCFS filed a petition under section 300, subdivision (b)(1), alleging three counts. In count b-1, DCFS alleged that S. was born suffering from a detrimental condition because he had tested positive for amphetamines, and mother's actions placed him at risk of serious physical harm. Count b-2 alleged that mother had a history of substance abuse and was a current user of amphetamine and methamphetamine, rendering her unable to care for the children. It further alleged that father knew or reasonably should have known that mother was using illicit substances while pregnant, and he failed to protect S. Count b-3 alleged that father was a current user of alcohol and marijuana, rendering him unable to care for S.

4

At the detention hearing on May 15, 2019, father requested that S. be released to him. Father's counsel argued, "The reports are pretty clear. . . . Father was not using." Counsel for DCFS noted that father did not complete his one scheduled drug test, and had told the social worker that he did not want his home assessed. Counsel for S. asked that S. be detained from father, and requested three consecutive clean drug tests before father be given unmonitored visitation. The juvenile court found a prima facie case for detaining S. from both parents. The court ordered family reunification services and monitored visitation for parents, allowing DCFS to liberalize visitation after four consecutive clean drug tests.

## B. Jurisdiction and disposition

A jurisdiction/disposition report filed June 25, 2019 noted that S. remained in foster care. The foster mother reported that S. "sleeps maybe 10 hours a day and shakes frequently with tremors daily." The report noted that when father and mother met with the social worker on May 24, father "admitted to a 10-year history of using meth on a daily basis." Father drug tested on May 28; the result was negative. Father attempted to enroll in a drug treatment program on June 24, 2019, but he was turned away after testing positive for methamphetamine; he was told he could enroll in the program once he tested negative. Mother had enrolled in an inpatient drug program. DCFS noted that mother and father had "unstable housing."

Mother called S.'s foster mother daily to check on S. Father "has called a few times to ask about the child's well-being." As of June 25, the date the report was filed, there was a plan to have S. begin visitation with both parents at their residential programs.

5

Mother told the social worker that on May 30, 2019, she and father had been in a physical fight.[3]  Father "broke mother's car window while she was inside the car, father pulled her hair and hit mother in the face. Mother did not know if she was hit by father with a closed or open hand."  DCFS stated that it planned to file an amended petition to address the domestic violence.

On July 8, 2019, DCFS filed an amended petition.  Count b-3 was amended to add that father was a current user of methamphetamine, which rendered him unable to care for S.  DCFS also added count b-4, which alleged that mother and father engaged in a physical altercation on May 23, in which father pulled mother's hair and broke the windshield of her car.  Count b-4 asserted that the physical altercation placed the children at risk of harm.

A last-minute information dated July 1, 2019 stated that the social worker met with father on June 26 at American Recovery Center; it was not entirely clear if father was enrolled in a program there.  Father said he had started using methamphetamine about three years earlier; "I used every day but not hard core.  It's not like I need it in my system."  Father also said he used marijuana.  When the social worker asked father if he thought he had a drug problem, father said, "No, not really.  I don't think I have a problem.  But I'm willing to do what is asked of me because I want my son back."  Father reported no concerns about mother parenting the children, and said she was a "good mother."

The social worker asked father about the domestic violence incident on May 23.  Father admitted breaking the windshield of

---

[3]This date appears to be erroneous; other references in the record state that the incident occurred on May 23.

the car, and said, "I'd rather break the windshield than hit [mother]. I really didn't pull her hair that bad. I just grabbed it from the back and stopped because that's not me. I knew what I was doing so I got out of the car and broke the windshield instead of hitting her." Father admitted he was under the influence of methamphetamine at the time. He denied any other domestic violence incidents between him and mother.

Mother told the social worker that she had been enrolled in a treatment program since June 14, 2019. Mother also said that she had been arrested in April 2019 after a police officer found her and father sleeping in a car; the officer discovered that mother had an active warrant. Mother tested positive for methamphetamine at the time. She said told the social worker, "Meth makes me throw up so I can't really use it heavily. I would use enough to make me numb from the pain. I would take 4 or 5 hits a day and I would use on the weekends. I was still able to work. I didn't feel it was stopping me from being able to function." Mother said father did not know she was using methamphetamine, and she did not know father was using methamphetamine. A last-minute information filed July 12, 2019 stated that mother had been discharged from her substance abuse treatment program on July 3 "after 3 residents disclosed they witnessed [mother] breastfeeding another resident's child." Mother enrolled in a different program the same day.

At a hearing on July 12, the court noted that the petition was amended by interlineation to strike counts b-1 and b-4, and to remove allegations against father in count b-2 addressing mother's substance abuse. Count b-3, addressing father's substance abuse, remained the same. Mother and father then entered no contest pleas to the petition as amended. The court

7

therefore found that the two children were persons described by section 300, subdivision (b) and declared them dependents of the court. Father's counsel noted that father was in a residential treatment program and had not had any visits with S.; she asked that a visitation schedule be arranged. The court ordered family reunification services, monitored visitation three times per week for three hours per visit, and set a six-month review hearing. The court also ordered DCFS to assess the possibility of placing S. with mother in her residential treatment program.

## C.    Six-month review

A status review report filed December 18, 2019 noted that G. remained with maternal aunt Mercedes, and S. had been placed in the home of maternal aunt Jasmine. Father was "in full compliance" with the case plan; he had completed his residential substance abuse treatment program, was living with relatives, and was employed full-time. Father had also enrolled in an outpatient aftercare substance abuse program, and completed a parenting education program. Father had attended weekly individual counseling while in his recovery program; his therapist told the social worker that father was making progress with his therapeutic goals. Father's ten drug tests between July 24 and December 16 were all negative.

Father had been visiting S. regularly. During visitation while father was in his treatment program, the social worker "observed [father] to be affectionate and responsive to child [S.] during his monitored visits. Furthermore, the approved monitors reported that the visits were going well with the father and child, and no concerns were reported." After father completed his treatment program, visits were monitored by maternal aunt Jasmine, S.'s caregiver, and "[t]here were no concerns reported

8

with [father's] visits." In November 2019 father's visitation progressed to twice-weekly unmonitored visitation for four to six hours each visit. Father lived with relatives, and planned to get a crib for S. after Christmas; DCFS stated that it would assess father's home for overnight visits once he got a crib.

A "concerned party" texted the social worker with a picture from social media "showing 12 empty beer bottles with the tag "on a Sunday afternoon." There is nobody pictured in the post, and there is a vague angle of what appears to be the bottom of the sofa in [father's] residence." The social worker discussed the issue with father, who said that cousins had been visiting the home and were drinking beer. Father said he did not leave S. with any of the family members during the visit. Father stated that he understood the social worker's concerns, and said he would not allow S. to be near intoxicated family members.

DCFS expressed some concerns about father's unmonitored visitation due to the alcohol present. The status review report stated, "DCFS would like to further assess [S.'s] safety and wellbeing while in the care of his father. On 12/18/19, DCFS conducted an assessment which indicated that the child would be at moderate risk for abuse/neglect while in the care of his father. Therefore, DCFS recommends that Family Reunification services continue for father."

Mother had completed her residential substance abuse program and was residing in a sober living home. Mother's visits with the children were appropriate. DCFS noted that mother was unable to have the children in her sober living home, and "[t]he housing issue is the only barrier that has prevented [mother] from receiving unmonitored overnight visitation with

9

the children." DCFS recommended that family reunification services continue for mother.

The status review hearing was held on January 10, 2020. The parties and court noted the lack of a last-minute information from DCFS. Father testified that he had obtained a crib, and DCFS had liberalized his visits with S. to include overnight visits. There had been two overnight visits in two weeks, and the next overnight was scheduled for the following weekend. Father also testified that he lived with his mother, his father, and his two siblings.

Counsel for DCFS argued that a home-of-parent order would be premature since overnight visits had just begun, S. was "very young" with "significant needs," and mother and father "are just beginning their sobriety." DCFS requested a "slow transition plan" to allow DCFS to work with parents to "ensure that the children are safely returned" to the parents' homes. Father's counsel argued that father was in full compliance with the case plan, all his drug tests were negative, he was attending weekly therapy, DCFS had not indicated any issues with the overnight visits, and father had significant familial support in the home. Mother's counsel also requested a home-of-parents order, noting that mother was in full compliance with the case plan and DCFS had not indicated any issues with overnight visits. Counsel for S. argued that a "home of parent order would be premature given that overnights just began two weeks ago." Counsel for S. agreed that a transition plan would be appropriate and suggested a shortened review period. The court invited counsel for DCFS to comment again, and counsel again stated that overnights "had just barely begun," but that DCFS was working on a transition plan.

The court stated, "The court finds by a preponderance of the evidence that return of the children to the physical custody of the parents today would create a substantial risk of detriment creating a continued necessity for and appropriateness of the current placement." The court found that parents' progress was "substantial" and "very commendable." The court stated that it would not enter a home-of-parents order "because the evidence before the court, in totality, does indicate that the issues were extremely significant in the substance abuse in this matter," including father's long history of methamphetamine use. The court continued, "[T]he parents have only just begun overnight visitation. And in comparison with the length of substance abuse, the period of sobriety is new. [¶] The court therefore finds that it is necessary for there to be additional reunification services with a transition of the children back into the parents' care." The court ordered DCFS to work on creating "a transition to extended visits," and set a review hearing for July 10, 2020.

Father filed a notice of appeal the same day.

## DISCUSSION

Father asserts two issues on appeal. First, he contends the juvenile court "violated father's due process rights when it required father to make an offer of proof before testifying at the six-month review hearing." Second, he argues that the court's finding of a risk of detriment was not supported by substantial evidence. We address these contentions below.

## A. The court did not limit father's testimony to his offer of proof.

Father asserts that the juvenile court violated his due process rights at the review hearing by requiring an offer of proof

11

and limiting the scope of evidence presented.  We find this contention to be unsupported by the record.

At the review hearing, the court noted that DCFS recommended continued reunification services, and asked if anyone wanted to be heard. Father's counsel said she had exhibits to proffer and would like to call father to testify.  The court admitted father's exhibits over DCFS's objection, and invited father's counsel to proceed.  After father was seated on the witness stand and sworn, the following exchange occurred:

"The court:  Ms. Koudsi [father's counsel], may I have an offer of proof as to this witness?

"Ms. Koudsi:  Yes.  I was hoping for a last minute to be provided by the department, but it wasn't.  Father would be testifying as to the fact that there was an indication that overnights would begin once a crib was provided.  Father has a crib.

"The court:  Just generally, please.

"Ms. Koudsi:  Father has already begun overnights.  That information is not in the report.  The only way to get it in is with testimony.

"Ms. Stehura [mother's counsel]:  And mother indicated the same. She's just initiated overnight visitation.

"Ms. Andresen [DCFS counsel]: And,  your honor, I was not made aware. I could have called this out before the hearing.

"The court:  All right.  Well, I'm assuming this will be brief.

"Ms. Koudsi:  It's just as to those two questions."

Father then testified briefly about the crib, his living situation, and his overnight visits with S.  DCFS cross-examined father by asking three questions about the dates of the overnight

visits.  All parties indicated that they had no further evidence to present, counsel presented their arguments, and the court ruled.

On appeal, father asserts that the court "required father to provide an offer of proof before he was permitted to testify," and he was "never given any room or leeway to explore the strength of the department's evidence."  He further asserts that the court "denied [him] his due process right to have a full contested hearing by limiting the evidence father was allowed to present in his testimony based on his offer of proof."  DCFS contends that father forfeited any arguments on this issue by failing to object in the juvenile court, and that father's rights were not violated.

Father's arguments mischaracterize the record.  In general, a "juvenile court cannot require a party to a review hearing to tender an offer of proof *as a condition to obtaining a contested hearing.*"  (*In re James Q.* (2000) 81 Cal.App.4th 255, 266 [emphasis added].)  However, "the juvenile court may make evidentiary requests of a party on any of a number of issues during the contested hearing itself."  (*Ibid.*)  Here, the court did not require an offer of proof as a condition to obtaining a contested hearing.  The court had already admitted father's evidence over DCFS's objection and had sworn father in to testify before inquiring about the nature of his testimony.  The court did not suggest that father's testimony must be limited, or state that father would not be allowed to testify on any subject.  To the contrary, father's counsel stated that she intended to ask father only about the crib and the overnight visits, and she was planning to inquire "just as to those two questions."  The court did not prohibit counsel from asking any questions.  The court's inquiry about the scope of father's testimony was not erroneous.

13

## B. Substantial evidence supports the court's finding of a risk of detriment.

Father also asserts that substantial evidence did not support the court's finding that returning S. to father would create a substantial risk of detriment. We review the juvenile court's finding of detriment for substantial evidence. (*In re B.S.* (2012) 209 Cal.App.4th 246, 252.) We draw all reasonable inferences from the evidence to support the findings and orders of the dependency court, and review the record in the light most favorable to the court's determinations. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

At a six-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (§ 366.21, subd. (e)(1).) "[T]he question whether to return a child to parental custody is dictated by the well-being of the child at the time of the review hearing." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 900.) "Until services are terminated, family reunification is the goal and the parent is entitled to every presumption in favor of returning the child to parental custody." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.)

Father contends he made substantial progress and "the fact that the court wanted to see father make additional progress given his lengthy substance abuse history was insufficient to show it was detrimental to return [S.] to his custody." He argues that his "substance abuse history is insufficient to show

14

presumed harm" to S. DCFS asserts that father's compliance with the case plan does not undermine the history of father's drug use that could place S. at a risk of harm.

DCFS is correct that father's substantial progress, while commendable, does not necessarily alleviate concerns about S.'s well-being. Eight months before the review hearing, S. was born with amphetamines in his system While mother was pregnant, she and father were homeless, sleeping in a car, and using methamphetamines daily. Father initially lied to DCFS about his drug use, later admitted using alcohol and marijuana, and even later admitted to an extensive history of methamphetamine use. Even as he admitted his daily drug use to DCFS, father represented that he did not think he had a drug problem, but he would do what he needed to do to get S. back. After S. had been detained from parents, father continued using methamphetamine and was refused entry to a substance abuse treatment program as a result. Meanwhile, while on methamphetamine father got into a physical fight with mother in which father pulled mother's hair and broke her windshield.

After father completed his inpatient substance abuse treatment program and had progressed to unmonitored visitation with S., father admitted that while caring for S., he had been socializing with cousins who were drinking beer—a situation that could be detrimental to S., could challenge father's newfound sobriety, and called into question father's judgment about his ability and willingness to control the environment surrounding S. Moreover, father had only recently obtained a crib and had only had two overnight visits with S. DCFS determined that returning S. to father's care presented a moderate risk of abuse or neglect.

15

Father compares this case to *In re Rebecca C.* (2014) 228 Cal.App.4th 720 (*Rebecca C.*), in which the Court of Appeal found that a mother's drug use, without more, did not demonstrate a risk of harm to 13-year-old child Rebecca. In that case, "the family residence . . . was clean, free of hazards, stocked with food, and clear of drugs and firearms. Rebecca denied any physical or emotional abuse, did not show any signs of physical abuse, and was not fearful of Mother. Rebecca was up to date on medical and dental checkups. Mother enrolled Rebecca in special education during the fourth grade; Mother regularly attended individual education plan meetings on behalf of Rebecca." (*Id.* at p. 727.) The court found that "the evidence in the case is not sufficient to support the finding that her substance abuse is causing, or there is a risk it will cause, physical harm to Rebecca." (*Id.* at p. 728.)

The comparison is not apt. Here, father did not have a background demonstrating a longstanding ability to care for S. Father had no other children and no history of caring for S. full-time. Two incident-free overnight visits are not comparable to the years of adequate parental care demonstrated in *Rebecca C.* Moreover, unlike the 13-year-old child Rebecca, here S. was only eight months old, and "'of such tender years that the absence of adequate supervision and care poses an inherent risk to [his] physical health and safety.'" (*In re Drake M.* (2012) 211 Cal.App.4th 754, 767.) Although father was making excellent progress at the time of the review hearing, the court was not required to disregard father's history as it related to a potential risk of detriment to S. if he were returned to father's care.

Thus, we find that substantial evidence supports the juvenile court's order directing DCFS to work with father on a

transition to extended visits, rather than issuing a home-of-parent order at the six-month review hearing.

## DISPOSITION

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, ACTING P.J.


CURREY, J.